## FILER v. McCORNICK.

(District Court, N. D. California, Second Division. July 28, 1919.)

No. 16188.

1. PROCESS ⟨⟩115—EXEMPTION FROM SERVICE—PERSON ENGAGED IN PUBLIC SERVICE.

The president of a national bank, which was a stockholder in a federal reserve bank, who at the urgent request of the governor of such bank attended a conference at the city where it was located, in another state, to consider means of selling government treasury certificates for war purposes, *held* engaged in a public service, and privileged from service of process in such state, not only during the conference, but during the next few days, while he was prevented by illness from returning home.

2. PROCESS ⟨⟩115—PRIVILEGE—EMPLOYMENT IN PUBLIC SERVICE.

The extension of the privilege or immunity from arrest or service of civil process to include, in addition to parties and witnesses attending court, persons engaged in performance of a public service, is not wholly statutory, but is based on the same considerations of public policy that originally led to the judicial exemption.

At Law. Action by Walter G. Filer against William S. McCornick. On motion to quash service of process. Motion sustained.

Howat, Marshall, MacMillan & Nebeker, of Salt Lake City, Utah, and Garret W. McEnerney, F. W. Henshaw, and Henshaw, Black & Goldberg, all of San Francisco, Cal., for plaintiff.

Harry G. McKannay, of San Francisco, Cal., and Frank J. Gustin and M. E. Wilson, both of Salt Lake City, Utah, for defendant.

VAN FLEET, District Judge. [1] This is a motion to quash service of process. The parties are both citizens, the plaintiff a resident of this state, and the defendant of the state of Utah. The action was filed on August 14, 1918, in the superior court of the state at San Francisco, and service of the summons was made on defendant the same date at that place. Thereafter the cause was duly removed here for diversity of citizenship, and the defendant, appearing specially for the purpose, has since interposed the present motion on the ground that he was not legally subject to service in this district.

As to the circumstances under which the action was commenced and the service had in this district there is little serious controversy—none as to the occasion which brought defendant into the state, the only disputed question of fact being whether he was necessarily detained here at the date service was made upon him. In that regard the affidavits in behalf of defendant tend to show, in substance, that defendant, a man over 80 years of age, has lived in Salt Lake City, engaged in the banking business, since 1873, and is the president of a bank at that place, which was at the time in question, and for some time previously, a member of the Federal Reserve Bank for the Twelfth Federal Reserve District; that in and prior to the month of August, 1918, the federal government was earnestly engaged, through its financial agencies, in selling certificates of indebtedness issued by the Secretary of

the Treasury, under the authority of Congress, for the purpose of raising funds for the carrying on of the war against the Central Powers of Europe, then in active progress, and on the first of that month there was a large deficiency in the quota of subscriptions for such certificates assigned for sale to said district, totaling approximately some $23,000,000; that in this situation it was considered urgently necessary that a conference be had of the representatives of the banks comprising the membership of the Federal Reserve Bank in the district for the purpose of devising ways and means for facilitating and accelerating the disposition of such certificates to make up this deficiency, and thus aid in financing the successful prosecution of the war; that thereupon such conference was called by James K. Lynch, then governor of said Federal Reserve Bank, to be held at San Francisco, the headquarters of the bank, on August 9, 1918; that by reason of his position in his bank, and his high standing and wide experience in important banking and financial matters, it was deemed by the officers of the Federal Reserve Bank as of great importance that the defendant should attend such conference, and to that end Mr. Lynch, the governor, sent him this telegram:

"San Francisco, California, 11:48 a. m., Aug. 5, 1918.
"W. S. McCornick, Pres., W. S. McCornick & Co., Bankers, Salt Lake City, Utah: You are invited and urgently requested to attend a very important one-day conference in Fairmont Hotel, San Francisco, at ten o'clock Friday morning, August ninth, of representative bankers from each state in Twelfth District, to determine best ways and means of selling United States certificates of indebtedness and to discuss general relation of banks to government war finance. Delegates will be entitled to reimbursement for transportation and hotel expenses. Please wire acceptance, and we will then engage your accommodations at Fairmont unless otherwise requested.
"James K. Lynch, Governor Federal Reserve Bank."

That defendant regarded and treated this request of the governor of the bank, under the circumstances, as equivalent to a command, and that it was solely in obedience thereto, and not to subserve any personal end or interest, or that of his bank, that he came to San Francisco; that, as stated in his affidavit, "I believed that under present conditions it was my duty to attend upon such conference as requested, and that my attendance thereupon would be in the performance of a public service in aid of the administration of governmental affairs," in which statement defendant is fully corroborated by Mr. Cook, the director of sales for the state of Utah of such treasury certificates, who had personally urged upon defendant the necessity of his attendance in order "that his advice and experience might be availed of for the benefit of the government"; that defendant arrived in San Francisco in time to attend the conference, which convened at 10 o'clock a. m. of August 9th, and lasted until 7:30 p. m. of that date; that while in attendance thereon he was stricken with severe abdominal or intestinal cramps, followed by dysentery, which rendered him so ill and weak that he was physically unable to return at once to his home, as he had contemplated, and, feeling that he was incapacitated for undertaking the return journey to Salt Lake for several days, on the following day, August 10th, with the advice of his wife, he went to the home of a brother in Santa Cruz

(a distance of 75 to 80 miles by rail) to recuperate, where he remained until August 13th, when he started to return to San Francisco to go home; that his weakness was yet such as to necessitate his leaving the train at San Mateo and remaining overnight, but he was able to continue on to San Francisco on the following morning, the 14th, and upon his arrival at the hotel, while arranging to leave for his home the next day, he was served with the summons in this case; that upon being served he got in communication with his attorneys in Salt Lake, and on their advice remained in San Francisco until August 20th to arrange for the removal of the cause to this court, and for no other purpose.

The statements of defendant as to his illness and physical suffering while in San Francisco are corroborated by the affidavit of Mr. Badger, a banker of Salt Lake, also in attendance at the conference, who had been intimately acquainted with defendant for 20 years, who noted his physical suffering at the conference, and his having to absent himself for a time, and who states that his appearance was such that he advised him that he was in no condition to make the return trip to his home without rest and recuperation; and by that of Mr. Raborg, likewise an intimate acquaintance in San Francisco at the time, who states that he saw defendant several times and that his appearance was such as to excite his anxiety for his welfare, and that he did not seem to improve while in San Francisco. The defendant's affidavit further shows that, prior to the institution of the present action, suit had been brought in the United States District Court for the District of Utah by the plaintiff against this defendant upon the same cause of action as that sued on in this case, which action was still pending at the time the present suit was brought and the summons therein served.

As intimated, the counter showing affects only defendant's physical condition while in the state as bearing on the question whether he was necessarily or reasonably detained here after the adjournment of the conference until the date of service; but as a whole it is of a meager and inconclusive character. It consists of several affidavits and some oral testimony. An affidavit by the process server, who had never before met the defendant, and was consequently wholly unacquainted with his usual appearance, is to the effect that when making the service he talked with the defendant, sitting in the hotel lobby, for "about a half hour," and got the "impression" that despite his advanced years he "then was in a remarkable state of good health and vitality," and appeared to him "as a man of the old pioneer stock who never grows old"; that he "marveled at his vigor and general excellence of good health"; and that he got the "impression" from his conversation that he and his wife "had come to California on a pleasure trip." Oral testimony by Mr. Wilson, an officer of one of the banks in San Francisco, is to the effect that he had known the defendant for some 29 years; that he saw defendant twice while he was in the city, the first time at the conference, and the last the day before he was finally returning to his home in Salt Lake; when asked as to his apparent condition of health, he said, "It appeared to me usual, very fair for a man of his age"—which he stated was 82 years; that he did not remem-

ber defendant making any complaint of illness, and, asked if he seemed "physically able to make the trip from San Francisco to Salt Lake City," answered, "He appeared to be; I know he was going the next day to Salt Lake City." The witness did not state how intimate his acquaintance with defendant had been, nor how frequently he had met him during the years he had known him, nor how recently prior to the occasion of his last visit to San Francisco he had seen him. There were also oral statements by two employés of the hotel at which defendant stopped in San Francisco: The first, by the hotel manager, to the effect that he had seen defendant twice in the hotel lobby during his stay; conversed with him the first time, but on the second occasion just saw him sitting there, but did not address him; asked, "What seemed to be his general condition of health at that time?" he answered, "I thought considering his age that it was very good;" that defendant did not complain to him of the condition of his health. So far as appears this witness had never met the defendant prior to the visit in question. The second, the assistant manager, states that he had known defendant some seven years; had seen him a number of times on previous visits to the hotel; asked as to his apparent condition of health, he answered, "All right, so far as I know;" that he had seen him in the lobby several times during his stay; that he did not recall defendant "making any complaint about his health"; that there was a house physician at the hotel, but there was no record of his having been called to attend the defendant. An affidavit of the plaintiff is to the effect that while, as stated in defendant's affidavit, there was at the date of commencing this suit an action previously brought by him against the defendant pending in the District Court of the United States for the District of Utah, in all respects identical with the present, such former action had, after the bringing of the present action, been dismissed and is no longer pending; that the present suit was not instituted for the purpose of harassing the defendant, but solely to enable plaintiff, for his own convenience, to prosecute it in the district of his residence.

The entire counter showing, it will be observed, was purely negative in character, possessing little, if any, probative value. The somewhat enthusiastic and picturesque "impressions" received by the individual serving the summons, in his brief interview, as to defendant's robust and vigorous appearance, and those of the hotel people in their casual, passing observations as to the apparent state of health of the defendant, may be dismissed as of no material value, and that of Mr. Wilson as of little weight. While the latter states that he had known defendant for 29 years, they were, it appears, at the time the statement was made, living at a long distance from each other, and there is nothing to indicate how often he had met him during that period, or that he had ever had any such intimacy with him as to render his judgment as to his apparent state of health of any weight. One may "know" another for an indefinite period without any such opportunity for observing his physical peculiarities as enables him to form an intelligent judgment of his state of health in a passing observation—a thing frequently beyond the ability of the

skillful physician. That defendant did not complain of being ill either to the hotel employés or to Mr. Wilson is equally of no moment. The disposition of aged men is rather to conceal than expose their ailments and infirmities—especially to strangers or mere casual acquaintances. Nor is it significant, if such be the fact, that defendant may not have called for attention by a physician. His suffering was from a cause which, while painful and weakening, most people of mature years can alleviate by their own care and attention, and defendant doubtless had as well the care and attention of his aged wife, who accompanied him. Some stress is laid on the fact that defendant, while claiming to be too weak to return home, was able to go to the home of a brother in Santa Cruz. But I cannot regard it as in any material respect tending to overcome the positive evidence of his illness and suffering. The distance was insignificant as compared with that to Salt Lake, and it was but natural, if his condition did not in his judgment admit of the long journey home, to seek the quiet and seclusion of a relative's home for rest and recuperation, rather than remain in the noise and bustle of a large and busy hotel.

Taking all the facts and circumstances presented into consideration, I have no difficulty in reaching the conclusion that they fully sustain the claim that defendant's physical condition afforded reasonable ground for his detention in the state, and that his remaining within the jurisdiction for that reason did not waive any right arising out of the circumstances which brought him here. Miner v. Markham (C. C.) 28 Fed. 387, and cases there cited. Indeed, in view of the advanced age of the defendant, a court might well hesitate, without the showing of any unusual physical condition of weakness, to hold that the brief period of rest taken by him before undertaking the return journey was so unreasonable as to deprive him of any right he might otherwise have.

This leaves but one question for consideration, but that the crux of the case: Whether the facts bring the defendant within the rule of immunity which he invokes.

The contention of the defendant is, in brief, that under well-settled principles of public policy one who temporarily enters a state or district other than that of his domicile, solely for the performance of a duty of a public nature, or to which a public interest attaches, is privileged from interference either by arrest under or service upon him of civil process, for a reasonable time in going to, returning from, and attendance upon the performance of such duty, and that the facts of this case clothe him with that privilege. · The contention of plaintiff, on the other hand, is, in substance, that except as extended by legislative enactment to other departments or functionaries, the privilege claimed is purely a "judicial" one, and attaches only to those who in some capacity, such as party or witness, are in necessary attendance upon a court or judicial proceeding; but that it has no application, in either aspect, to one engaged in the performance of a service such as that here involved.

The doctrine contended for had its origin at the common law, and undoubtedly in its inception, as administered by the courts of England,

had relation only to judicial proceedings, in which aspect it was in no way dependent upon statute, but was the outgrowth of the efforts of the civil courts to protect the administration of justice from interference with suitors, witnesses, and perhaps others, through civil process from other courts of a nature found to derogate from orderly proceedings and jeopardize the ascertainment of truth. Originally it was asserted solely as the privilege of the court for the protection of its own jurisdiction, but later as that of the person concerned as well. Bacon's Abr. tit. "Privilege." What the precise limits of the right were in its earlier history, or those to whom extended, it is not very material to here inquire. The question is left in some doubt through divergent statements as to its scope, not only from judges, but from early commentators on the subject. See the interesting opinion of Judge Lobingier in Berlet v. Weary, 67 Neb. 75, 93 N. W. 238, 60 L. R. A. 609, 108 Am. St. Rep. 616, 2 Ann. Cas. 610. It is sufficient for present purposes to say that the doctrine in its different aspects has been a growth, rather limited in its scope, and somewhat jealously regarded in its earlier history, but gradually gaining favor, and broadening in its field of application as its essential value became better appreciated, until its enforcement has in later times come to be recognized not only as a substantive right of the individual concerned, but as a matter of established public policy, resting upon sound principles of justice and right. It is now very generally recognized as extending not only to immunity from arrest, but from service of process as well. And while it is quite true that the right has most frequently arisen and been applied in connection with parties and witnesses in judicial proceedings, its extension in the process of time to those engaged in other departments of the public service has been more largely by analogous application by the courts than as a result of legislation. These principles may be gathered from the large number of cases cited with approval in Stewart v. Ramsay, 242 U. S. 128, 37 Sup. Ct. 44, 61 L. Ed. 192, the latest expression on the subject from the Supreme Court, and from those hereinafter referred to. These authorities further show that while a few of the state courts, as in Berlet v. Weary, supra, are still inclined to apply the doctrine with somewhat archaic strictness, the greater number, as do the federal courts, take an enlarged and liberal view of its application. The fundamental basis of the doctrine in its judicial aspects is very clearly stated in Stewart v. Ramsay, as embracing the right of the courts "to be open, accessible, free from interruption, and to cast a perfect protection around every man who necessarily approaches them"; that the citizen in asserting his legal rights shall be free to approach the courts, "not only without subjecting himself to evil, but even free from the fear of molestation or hindrance"; and that he shall enjoy the correlative and essential right "to procure without difficulty the attendance of all such persons as are necessary to manifest his rights." And emphasizing the importance in attaining these purposes, that the litigant and his witnesses be protected from molestation, it is said:

"Now, this great object in the administration of justice would in a variety of ways be obstructed if parties and witnesses were liable to be served with process while actually attending the court. It is often matter of great im-

portance to the citizen to prevent the institution and prosecution of a suit in any court at a distance from his home and his means of defense; and the fear that a suit may be commenced there by summons will as effectually prevent his approach as if capias might be served upon him. This is especially the case with citizens of neighboring states, to whom the power which the court possesses of compelling attendance cannot reach."

It is these considerations which have actuated the courts in extending the protection of the rule, so limited in the beginning, until it has come to embrace practically every one who may be called to a strange jurisdiction in connection with a cause, and every proceeding or step in the action, either heard before the court or any of its officers, and to appearances before legislative committees and kindred investigations as well. Alderson, Judicial Writs and Process, § 121. And an examination of the authorities will disclose, I think, that it is upon quite cognate principles that the doctrine has been given application beyond the domain of judicial proceedings to embrace other departments of the public service.

[2] The plaintiff contends that in its latter aspect, which he denominates the "governmental" privilege, the right is a distinct and separate thing and wholly the creature of statute; excepting only as to the immemorial privilege enjoyed by members of Parliament, which it is claimed went no further than immunity from arrest. But the authorities do not, I think, bear out this view. It is true that as to the extent of the immunity enjoyed by members of Parliament the authorities are not in harmony and the question is left in some doubt. Berlet v. Weary, supra, seems to support plaintiff's contention; but Juneau Bank v. McSpedan, 5 Biss. 64, Fed. Cas. No. 7582 and Miner v. Markham are opposed to it. In Juneau v. McSpedan, Judge Miller states that "in England the privilege from arrest has always been construed to include the service of a summons"; and this view is sustained in Miner v. Markham. But the question is somewhat immaterial, except as to its historical value, since the cases in this country show a number of instances in which the so-called "governmental" privilege has, in the absence of specific legislative provision, been recognized and applied; and this apparently for the same underlying reason, and inspired by the same public policy, as that which dictates the application of the doctrine in judicial proceedings, to the end that the public service may not be interfered with or interrupted, and the interest of the people in an efficient administration of the laws thereby jeopardized. Thus in Doty v. Strong, 1 Pin. (Wis.) 84, the Supreme Court of the then territory held that the immunity from arrest guaranteed to members of Congress by the Constitution (section 6, art. 1) must be construed as including exemption from service of process as well, and also as extending to delegates from territories, though not covered by its terms; and in its reasoning the court says:

"A liberal construction must be given to these words upon principle and reason. It is just as necessary for the protection of the rights of the people that their representative should be relieved from absenting himself from his public duties during the session of Congress, for the purpose of defending his private suits in court, as to be exempt from imprisonment on execution. If the people elect an indebted person to represent them, this construction of

the Constitution must also be made to protect his rights and interests, although it may operate to the prejudice of his creditors; but the claims of the people upon his personal attendance are paramount to those of individuals, and they must submit."

In Anderson v. Rountree, 1 Pin. (Wis.) 115, the same court gave like construction to the territorial statute exempting members of the Legislature from arrest, holding that it included immunity from service.

In Miner v. Markham, supra, the provision of the Constitution considered in Doty v. Strong was for similar reasons held to include the exemption of a member of Congress from service of process while in progress from his home to the seat of government to attend a session.

In Bolton v. Martin, 1 Dall. (Pa.) 296, 1 L. Ed. 144, it was held, as early as 1788, by the court of common pleas of Philadelphia, that a member of a state convention called to consider the Constitution of the United States was privileged from service of civil process while in attendance upon the convention.

In Geyer v. Irwin, 4 Dall. (Pa.) 107, 1 L. Ed. 762, the Supreme Court of Pennsylvania, in the course of its opinion (rendered in 1790), states that "a member of the General Assembly is, undoubtedly, privileged from arrest, summons, citation, or other civil process during his attendance on the public business confided to him." It is claimed that this expression was mere dicta; but, if this be true, it is nevertheless of value as indicating the trend of judicial thought on the question in this country.

In Land v. Rambo, 174 Pa. 566, 34 Atl. 207, the same court, as late as 1896, held, in the absence of a statute, but in pursuance of what was deemed established public policy, that members of the national guard, holding an encampment under authorization of the Governor, were exempted from service of process while on duty, and in going to and returning therefrom.

And in a discussion of the whole subject in his work on Federal Practice, Mr. Foster, upon a review of the authorities, states it as his opinion that "a similar exemption would probably be applied to any person while temporarily within the district in the discharge of a public duty." Foster Fed. Prac. (5th Ed.) § 167.

These cases are strongly criticised by counsel for plaintiff as being based upon an entire misconception of the history of the doctrine; but I find myself unable to coincide with that view. I think, to the contrary, that while in a measure one or two of them may have involved a misapprehension of the then state of the law in England, they nevertheless disclose the distinct tendency of the courts of this country to give a broader and more comprehensive application of the doctrine than that obtaining in the English courts—springing perhaps from the strong tendency of the former to jealously protect and regard the rights of the people, and in obedience to what was regarded as a well-defined public policy.

As a result of these principles, while the present case may be said to be somewhat novel in its circumstances, and not precisely on all fours with any instance heretofore presenting itself for adjudication,

I am, nevertheless, constrained to the view that it falls quite clearly within the reason and analogy of the rule as contended for by defendant. It is argued that defendant was not an officer of the government, and did not come into the district in any official character. It is true, if that be material, that he was not an "officer," perhaps, in the strict, popular sense of the term; but by reason of his position in his bank, and the relation of the latter to the Federal Reserve Bank, I do not think it may be said in any absolute sense that, in acting upon the request of the president of the latter to participate in a conference or convention which the latter unquestionably had the authority to convoke, and upon a matter of such vital interest to the government, his attendance was not pro hac vice in an official capacity. It is not, and certainly may not be, claimed that in attending that conference he was not performing a public service of the greatest moment to the government and of interest to the country. One cannot readily conceive of a higher duty to their country—except it be on the battle front—than was being performed by the members of that conference, when we consider the urgent and absolute necessities of the government for means with which to finance the gigantic struggle in which we were then engaged; money at such a time may be said to be the lifeblood of a nation. But it is said defendant was not "compelled" to attend; that there was no power in the president of the Reserve Bank to require his presence; that therefore he must be regarded as coming of his own volition, and hence is not in a position to invoke this privilege. As to that, neither is a nonresident witness, nor a party, for that matter, "required" to attend a trial. If they come they do so of their own volition, and for the furtherance, in any particular instance, of merely private interests. It would be a singularly inconsistent public policy that dictated the protection of such a class, and denied it to those engaged in serving solely the public good. Such a policy would very probably have deprived the country during the critical period through which we have just passed of services of the highest value, gratuitously rendered, by the large number of patriotic citizens who, like the defendant, dropped their private interests, and betook themselves far from their homes to render aid to the administration of a character which could not have been coerced. It is at least doubtful if those citizens would have given the same ready response to the dictates of their patriotic sense of duty had they been advised that the law was powerless to afford them protection against liability to harassing litigation to which they might be subjected by private suitors in strange and remote jurisdictions.

Lastly, however, it is urged that the service rendered by defendant in attending this bankers' conference was "completely *extra legal,* not recognized nor provided for by law." But obviously if the president of the Reserve Bank had the authority to call the conference, which is not seriously questioned, when so called it certainly was a governmental function, and not a private one, and those who attended in obedience to his request were clearly in the performance of a "public service"; and that it was a public service within the scope and application of the doctrine under consideration I entertain no doubt.

Surely, as it seems to me, a public policy which declares that the administration of justice will be advanced and promoted by the character of protection afforded by the immunity claimed should not stop short of extending like protection to a service essential to the preservation of the country itself.

This conclusion is reached with less reluctance in that, while avoiding great inconvenience and harassment to the defendant, it works no great hardship upon the plaintiff; no essential right being lost to him. His cause of action may readily be reasserted in the jurisdiction originally resorted to, as to which, no such question can arise, and where his rights may be as fully and completely adjudicated and protected as in this; and, moreover, should he desire to seek a review of the pending question, it may readily be accomplished (Stewart v. Ramsay, supra) well within the life of the obligation sued on.

The motion to quash the service will therefore be granted.